22-13642 OHI Asset et al. v. George Wagner, III Mr. Scott. Thank you. Good morning, Your Honors. I'm Patrick Scott from the law firm of Gray Robinson. I represent the appellant George Wagner who's sitting in the back of the courtroom. Mr. Wagner is the debtor in this case. The I don't plan to talk about jurisdiction. I'll rest on the briefs. I feel like we've said everything that could be said about jurisdiction unless Your Honors will have a question about it. I do have a quick question. I just want to be clear in terms of the remand back to the bankruptcy court. Is there nothing else that the bankruptcy court could have done on remand? Nothing. It could only have entered the discharge, which it did. You mean not enter? It could only have entered the no discharge. I'm sorry. Correct. The no discharge. It's actually entered by the clerk, but in this instance, the bankruptcy judge directed it because the district judge in sending the case down said to comply with this order. So the only thing the bankruptcy judge could do would be to direct the clerk to enter a no discharge. Correct me. As to the merits, I'll call the the appellants OHI and the the appellant Mr. Wagner and the appellees OHI. They didn't cross appeal from an issue, from one issue, and it narrowed the case down for this appeal so that the only thing remaining in this appeal is whether Mr. whether the bankruptcy judge committed clear error in concluding that Mr. Wagner had not knowingly and fraudulently concealed assets on his bankruptcy schedules. The knowing part is is true in this sense. He knew he was not listing a horse. The horse was not on the schedules. He knew that he was not listing a horse or the lease of a horse or the income from that lease in 2019 on his schedules. The issue really in the trial was whether whether he owned the horse and if he owned the horse, was it fraudulent that he didn't list it or was it something less than fraudulent? Judge Grossman, who was a longtime bankruptcy lawyer before he was a judge in the bankruptcy court in our district, held that it was not fraudulent and that perhaps Mr. Wagner had not even owned the horse during the years before the bankruptcy. Judge Smith reversed that saying that there was clear error in concluding that it was not knowing and fraudulent and that it was in fact knowing and fraudulent and that's how we got before your honors. The the problem with Judge Smith's ruling begins with the fact that he refers in his summary on the last page of his ruling to there being a horse, the horse being owned by Mr. Wagner, the horse and lease and income being left off the schedules and therefore it was knowing and fraudulent. In fact, the cases talking about knowing and fraudulent emphasize that there's two different aspects to that. Something can be and that's what happened and somehow Judge Smith just came to the conclusion that Judge Grossman got it wrong on the facts. It's not somehow. I mean there was a lot of extrinsic evidence. In fact, you had the May 2019 email to his attorney where he's identifying the horse as an asset. You have the email conversation with his wife in which he specifically references the bankruptcy court proceedings and trying to limit the number of his assets. So even if we give due weight to the bankruptcy court's credibility determinations, there seems to be a lot of extrinsic evidence that could overcome that. Well, but to overcome that you would have to meet a high standard because this is a case where the three Wagners all testified. The judge heard and observed their candor and demeanor. He heard their explanations. He credited their explanations and the emails in question he addressed. Judge Smith said he failed to consider these emails, but in fact in his four or five page ruling, which he read at the end of the trial, he specifically considered each of them. Judge Smith was just wrong. Every one of those emails was specifically considered by Judge Grossman and he explained why it was that he didn't believe each of the emails has two possible explanations. And Judge Grossman, after hearing the testimony, accepted the possible explanation. Judge Smith, to be able to reverse on the facts, should have had to conclude that Judge Grossman missed something that overcame the testimony. And these examples you cite, Judge, are examples of emails that had two different possible meanings. He was going through a divorce at the time. He was writing to his wife telling her, you should have as much as possible and be as little as possible. Going into the bankruptcy, he had very little, of course, but you could look at it as Judge Grossman did in light of the divorce, which is something that Judge Smith didn't focus on at all as being something. Your best answer to Judge Abudu's question is that the evidence, if viewed in a certain way by a fact finder, could have led to a contrary result. And that's all it needed. It didn't compel a contrary result under the clearly erroneous standard. That's right. And if you've seen some of these, I think most of the judges, not your honor, on the Southern District Bench cite the five-week-old dead fish quote from Judge Bauer in the Seventh Circuit. The case of the presentation of evidence supporting the winning party, the Seventh Circuit said, had to be so bad it would be like a five-week-old kettle of dead fish. And while that was a colorful quote, it's been quoted, in fact, several times by your court, by this court. It's not wrong to say, as the Third Circuit said, that when looking at the standards of clearly erroneous that Anderson and Gypsum out of the Supreme Court set many years ago, that that permissible range of finding by the trial court should not be overruled unless, I should give the quote, they have, the Third Circuit and five, four other circuits have adopted this test. It's the responsibility of an appellate court to accept the ultimate fact determination of the fact finder unless the determination is either one, completely devoid of minimum evidentiary support displaying some hue of credibility, or two, bears no rational relationship to the support of that cited in page 17 of our brief. The Eleventh Circuit has not refined the test so. It has not chosen to go beyond Anderson and Gypsum and narrow what is the range of permissibility of a lower court's finding. There's really no need to. I mean, the Supreme Court has refined or given different formulations to the test itself. One of the most recent ones is Cooper versus Harris where the court says that if a finding is plausible in light of the total record, it stands. Even if more than one finding is plausible. Correct. Right. So it wouldn't matter if Judge Smith, Judge Smith doesn't get a fresh look, right? He can't, he can't look at the facts and say I'm re-weighing them in a fashion that they should have been weighed, giving appropriate weight to certain things that should have been given more weight. That's not within his purview to do. He has to look at the facts as established by the bankruptcy court and determine merely whether they were outside the range of permissible conclusion. And the ultimate fact here, whether the omission was knowing and fraudulent, is a combination of many subsidiary facts, many of which are uncontested. It's uncontested that those emails were sent. It's uncontested we laid out in the brief all the things that were uncontested. Judge Smith just chose to take several things that were explained by Judge Grossman and he explained why they weren't overpowering in their effect. And as I say, although Judge Smith said, as would have been necessary to overrule Judge Grossman, that Judge Grossman failed to consider some fact in, in coming to his conclusion. Because if he considered all the facts and came to the conclusion that was wrong, you'd have to blame him with dishonesty or corruptness or something that somebody could, they either had to not consider the fact or they had to, they had to be biased in some fashion. So nobody claims that Judge Grossman had any bias here. It had to be that was outside the permissible range of what a judge could have concluded from the facts. All right, Mr. Scott, thank you very much. You've saved your time for rebuttal. I have. Thank you. Mr. Aiken. Good morning, your honors. Layton Aiken on behalf of the appellee OHI with me as counsel Mark Hildreth. I'd like to just first address the question that the panel asked about remand. It wasn't the appellee's position that the remand just meant enter the order. If you look at their motion to clarify, they were asking Judge Smith whether the remand should all, should remand for the bankruptcy court to have an evidentiary hearing on the affirmative defenses that the appellee raised in the trial. Judge Smith overruled that saying you didn't cross appeal about the failure to adjudicate the affirmative defenses and therefore I think the remand was not, as indicated by their motion to clarify, the remand was not simply to enter the order. That was not their position below. Well, my understanding though is that in the that it was the improper vehicle perhaps that was used to have that reconsideration and if that indeed Mr. Wagner had employed, you know, one of the bankruptcy rules, then it would be a different situation. That's right, but it's it's rule 8022 which is a motion to re-hearing for re-hearing and I believe it's rule 6B2A1 which only provides that an appeal before disposition of a rule 8022 motion for re-hearing, that appeal becomes effective once there's the disposition of the motion for re-hearing. They've conceded that their motion to clarify was not a motion for re-hearing and therefore what essentially they did was they appealed a non-final order. Now, they read the rule 6B2A1 as relating to any post-trial motion. It only relates to motions for re-hearing and again they said the motion to clarify wasn't a motion for re-hearing. Therefore, they were duty-bound. It's our position to invoke jurisdiction of this court. They were duty-bound to after Judge Smith denied the motion to clarify to then re-up their appeal, re-appeal and that's why we don't believe the court has jurisdiction. As to disclosure and the 727A2, I think there's some fundamental flaws in their arguments. One is their position really is the deference under Anderson is no deference at all. It's not conditional. That if the prior fact determines a witness to be credible, it doesn't matter what the extrinsic evidence is and that's not what Anderson and its progeny say. The other issue they ignore in their papers is that the cases in this circuit have held uniformly that circumstantial evidence can establish fraudulent intent. I think you're right on both of those things but can you think of a case where a first-level court, bankruptcy or district court, has heard from live witnesses, made credibility determinations and made a finding of fact on a mental state such as fraudulent intent that has been overturned on appeal? Yes, we cited in our papers, your honor, it's the law case out of the 8th circuit. It's under 523A6, not 727A4A. But the scenario in that case is exactly what we have in this case. The bankruptcy court held based on the perceived credibility of the witness that the witness was entitled to a discharge. On appeal to the district court, the district court disagreed based on the extrinsic evidence. And the 8th circuit agreed with the district court and in the law case, the 8th circuit says, as illustrated by the district court's opinion, the record is replete with documentary evidence and inconsistencies that contradict the testimony and the finding of the bankruptcy court. It goes on to say, we conclude that the bankruptcy court's based on credibility determinations were clearly erroneous under the scope of review outlined at Anderson. So that's one circuit court of appeals. You don't see this very often. But in this case, the evidence is so one-sided as to make this case not even close. Can I ask you a question that's bothering me about the case? So if I understand right, and I've had a couple of these kind of like this, the way these schedules get prepared is the debtor sits down with their lawyer and says, here are my assets, you know, signs the disclosure and then it's filed. Is that about right? Yeah. I've never seen one where a debtor left off something on their disclosure where there's evidence that the lawyer knew about it. Um, and there's evidence of that here, right? The lawyer asks him, do you own this horse? Right. Clearly inquired as to the horse and the lease of the horse. Yeah. And, and the horse was disclosed previously as a zero value horse. A horse. Something. Yeah. Okay. It could have been a horse, I guess. Um, by saying that, given that, by saying that the debtor, uh, fraudulently failed to disclose the horse, are we also saying that the lawyer committed a fraud on the court as well? No. Why not? Because they didn't disclose what the testimony was is that when Mr. Wagner got this inquiry from his bankruptcy judge, he sent it to his wife, his estranged wife, she kept all the records and she testified that she sent to her husband a copy of the purchase agreement. Uh, she's, uh, she sent, um, at the time she knew the horse was leased. She knew that the lease contained a representation in it where Mr. Wagner said, represented he was the owner of the horse. She knew at the time that the rent was never, uh, transferred to her daughter, the alleged owner of the horse. And both of them testified that they have no documentation under the Florida Uniform Transfer to Minors Act or any bill of sale where this horse that was clearly purchased by Mr. Wagner was somehow, um, transferred to the daughter. I think the, the bankruptcy lawyer took that on face value that it was never communicated to him about the lease, about ownership of the horse. It was just never sent to him. So he just said, oh yeah, there's a horse, but it's owned by my daughter. The bankruptcy attorney didn't testify at the hearing. Um, so would you think given your view of the evidence, would you have been entitled to summary judgment on this issue? Your answer has to be yes. Well, it is yes. And I'm trying to remember. This record viewing the evidence in the light most favorable to Mr. Wagner, no reasonable jury could find that he lacked fraudulent intent. That's correct. Right. So you would be entitled to summary judgment on this record, despite testimony from the debtor himself that he did not act knowingly and fraudulently within the terms of 727A4. I guess if he submitted an affidavit in response to summary judgment to say notwithstanding all the evidence that shows I own the horse, I didn't own the horse. Does that create a fact issue? It might. I don't know. That's what happened at trial. Huh? That's what happened at trial. Well, but I think testimony is an affidavit. It's the same thing. I, I, I, I understand. You've got an issue. But, but the standard on summary judgment's a little different. Not really, because the quest, the ultimate question is viewing the evidence in the light most favorable to the non-moving party. Can a reasonable jury find for that party? Right. Isn't that the standard? Well, under Anderson, I think the standards are slightly different. I think the standard is that the trial judge cannot insulate his findings from review by denominating them as credibility determinations. Documents or objective evidence may contradict the witness's story, which clearly that happened here. Or the story itself may be so internally inconsistent or implausible in its face that a reasonable fact finder would not credit it. Where such factors are present, the court of appeals may well find clear error, even in a finding purportedly based on credibility determination. So, I don't think, I mean, it's clear that the appellee testified he didn't believe that he owned the horse. He didn't say he didn't own the horse. His testimony was that he didn't believe he owned the horse. But not owning the horse only leads inevitably to the conclusion that he made a false statement. It doesn't lead inevitably to the conclusion that he acted with fraudulent intent. Those are separate issues, although they're related. But I think Judge Brashear hit the nail on the head. When your bankruptcy counsel inquires about the horse and the lease, and you don't give them the information to disclose it, they didn't even I mean, I think, listen, I think I've read the record. I think you've got a strong case, but you lost before the fact finder. And that's my concern that we're coming dangerously close if we affirm to saying if a district court has a different view of the evidence. I mean, you've got you've got the statement in Cooper versus Harris from the Supreme Court saying that if a finding of fact is plausible, even if another is equally or more so, that finding stands. And that's a high bar. There's no question. But I think there's two things saying that you believe you don't own a horse in light of all the documentary evidence to the contrary. I think the bankruptcy judge got it wrong. And your honor, to your point, if that's really the message that we're sending, that we're we're sending a message that a debtor who's a credible liar is entitled to a discharge no matter what assets he doesn't disclose. All he has to say is I didn't believe I owned the asset. Let me ask you to address this because I think this is part of the kind of the linchpin of the bankruptcy judge's ruling. The bankruptcy judge said something to the effect of look at all of the stuff that he disclosed. He disclosed the wine in the basement. He disclosed the car that his daughter drove. He disclosed all these other assets. Given the breadth of his disclosures, it doesn't make sense to think that he was trying to hide the horse. What do you say about that? I think it's just the opposite. I think it's indicia that he was intending to intentionally hide the horse. He has these complete schedules. He leaves off your honor. But your theory of why he's trying to hide the horse is to keep the horse out of the bankruptcy, right? That's the idea? Yes. So why would the fact that he's putting all this other property in the bankruptcy that he also could have hidden? I don't know what capitalization rates are on horses, but if you can get $60,000 in six months for the lease of a horse, you double that, it's $120,000 on a 10% cap rate, that horse is worth a million, too. And so I think it was a very valuable horse. I think the family intended to make sure that horse was kept in the family, in the daughter. In the schedules, he didn't list any income. I think there were some insurance proceeds he listed. When they got $60,000, that's not insignificant funds. They got $60,000. Nobody's explained to this day. You may not believe you own the horse, but nobody to this day has explained why that $60,000 wasn't on the schedules. It had to be on the schedules, and it wasn't what they explained as, well, the daughter was in college. The daughter had bank accounts at the time. We established all that. They could have easily transferred the money into her bank account. The very next year, after the filing, the daughter leased the horse, and the income was put into her bank account. So there was absolutely no reason not to disclose, A, ownership, and B, the rental income, you know, there was no reason unless you were intentionally trying to not disclose ownership of what we think is a very valuable asset. Well, the financial incentive is not the only one. I mean, I think the record also strongly supports that he wanted to protect a gift, some might call, to his daughter, and so it doesn't only have to be a financial incentive to support the fraudulent behavior. It can also be emotional, personal, right? It could be, but if that's the case, then disclose it out of an abundance of caution, and say, I gifted this to my daughter. But if he gifted it to his daughter, why did he keep the rental income? Nobody's ever explained that. And I think that is clear indicia of fraud. It's clear indicia of fraud, notwithstanding all the other facts in this case, including the fact that the attorney inquired. He was taken off just a few weeks before he met with his, or as he was meeting with his bankruptcy attorney, he was taken off as the additional insured of the horse for, quote, asset protection. That's a pretty, that's a term of art in the bankruptcy world. So he's taken off for asset protection. This was a clear case of intending not to disclose what the family believed to be a very valuable asset, unless the court has any other questions. Oh, thank you very much. Thank you. Mr. Scott. Excuse me, I injured my back over the weekend if I'm here to be walking slowly. I'm really just going to address the things that were brought up by Mr. Lakin in no particular order. It was the wife, the estranged wife, who shortly before the bankruptcy demanded that his name be removed as an additional insured on the insurance. It was not him, according to the record. The abundance of caution, if I agree, if I were his attorney, I, in an abundance of caution, and have done it, although I don't represent debtors anymore, listed something and put a defined fraudulent intent is a long way away from abundance of caution scheduling. Cap rate, that's something off the record. That's Mr. Lakin is speculating about a million dollar horse. The record showed, as I recall, that they paid $175,000 for the horse some years before the bankruptcy, four years before the bankruptcy. That the, that the, a change was made after the daughter became an adult, so that the income received in 2019, when she was still a minor, or maybe was a freshman in college, was was kept in the joint husband and wife account. That's true, but Mr. Lakin misremembers the trial if he thinks there was no explanation of what was done with the money. They explained that they used the money to sustain the horse, which is a very expensive proposition to take care of a horse. Um, your honors had heard from Mr. Lakin that that this was the kind of motion, going back to jurisdiction for a moment, this was the kind of motion for clarification that that should have told the appeal, and so only after it was ruled upon, but he would it become ripe for appeal, but he has agreed in his prior papers that it was not a Rule 22 motion. This court and the Supreme Court have long since established that you don't determine a motion by its title, a post-judgment motion, you determine the motion by the character of what it's asking for, and he's agreed it was not a Rule 8022 motion. Unlike Rule 4a, that tolling rule is specifically overridden in Rule 6, and Rule 6 says only 8022 motions told the time, and they mean 8022 motions in character, of course, not in title, but he has agreed this was not a Rule 8022 motion, and there's no reason that motion for clarification would have told the time. It's well covered in the briefs. The, oh, a lot of talk is about the standard, and the Anderson standard, and we asked, or we challenged, perhaps in our brief, him to find any case that found that a determination of fraudulent intent was overridden, the trial court's determination of fraudulent intent, or no fraudulent intent, was overridden by a district judge, or a district judge's determination of fraudulent intent, or no fraudulent intent, was overridden by a court of appeals. Waugh is not such a case. I cannot find such a case. I've never heard of such a case. If you read Waugh, you'll see Waugh. Waugh was decided by the Eighth Circuit before this court, and later the U.S. Supreme Court determined that reckless disregard is not a proper standard to be applying under Section 523A6. It's not a loss of discharge case. It's an exception from discharge case, and the, if you look at that decision in Waugh, you'll see what it's really about is whether it meets the, this court's case was Walker, the Supreme Court's case was Geiger, whether it met that standard, which was an intentional, tortious act as to which the debtor was substantially certain injury would result. In that case, it was stripping his company of assets so that his creditor couldn't recover from his company. That's what that case was about. That case was not a case that turned on fraudulent intent, and I believe there are no cases, because although I can conceive of such a thing, I don't think it automatically, as Mr. Lakin has raised, raises the specter of a debtor saying, I didn't commit fraud, therefore I'm off the hook, and if he finds a gullible bankruptcy judge somewhere, he gets off the hook by saying that. I don't think it means that at all. I can think of situations, I haven't found one, but for example, if the debtor admitted fraud in a testimony, and I'd like to think that bankruptcy judges are good enough judges to be able to spot that. If the, if the wrong legal standard was applied, there are some cases where the bankruptcy judge applied the wrong legal standard to the facts, and the court in determining the ultimate fact overruled the bank, the district court overruled the bankruptcy court because the wrong standard was applied. Here, it was Judge Smith who applied the wrong standard. If you go back and read his summary, which ends with, that's why he should not receive a discharge, nowhere does he speak of fraud or fraudulent intent in the summary. He draws the conclusion that the horse was owned by him, by the debtor, that the debtor didn't schedule the horse, and therefore, and knew he didn't schedule the horse, therefore he committed fraudulent intent. This is, at best, one of these abundance of caution cases, and I think the judge reckoned, the long-time practitioner of this judge, recognized that in pulling together all the facts, and he discussed all the facts. All right. Thank you. I think we've gotten to your position. Thank you both very much.